UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                                   :

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:13-CR-138-1 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | ORDER & OPINION |
| | : | [Resolving Doc. 17] |
| JAY J. NAGY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

A grand jury indicted Defendant John Nagy for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) and possessing a stolen firearm in violation of 18 U.S.C. § 922(j).  Nagy moves to suppress evidence obtained during a search of him and his arrest on February 17, 2013, including statements that he made to officers and a firearm retrieved from his person.  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Nagy's motion.  The Court grants Nagy's motion to exclude his statement to the effect that he got the gun from a car in Springfield Township.  The Court denies Nagy's motion to suppress other evidence and statements obtained during the stop, including Nagy's statement that he had a gun and the gun itself.

**I.**

On February 17, 2013, around 3:20am, Akron police officer Dan Metzger responded to a call from a caller who reported that someone had been tampering with his car.  Metzger arrived at the caller's home, spoke with the caller.  The caller identified footprints in the fresh snow leading away from the car and up the road.  He indicated he had followed the fresh footprints until the police

-1-

Case No. 1:13-CR-138
Gwin, J.

arrived upon the scene.  Metzger radioed for backup, and he, along with two other officers, followed the footprints down the streets of the residential neighborhood for approximately an hour.

The footprints approached approximately five to twelve other vehicles, going through yards and driveways.  Eventually, Metzger followed the footprints up an embankment where he saw a 2009 Ford Escape parked in a driveway and a man dressed in black with a large black backpack leaning into the car through the driver's door.  Nagy stopped his police cruiser and the person stood up and walked around to the front of the Escape.  He was holding a cup of change, apparently taken from the vehicle's cup holder.  Metzger later identified this person as the Defendant, Jay Nagy.  Metzger testified that although Nagy had several layers of clothing on, he noticed a bulge in the left side of his coat in the waist area.

Metzger asked Nagy if he could speak with him, and Nagy took two or three steps back, but did not flee.  Metzger then instructed Nagy to put his hands on his head and handcuffed him.  Metzger also asked Nagy if the Escape was his car.  Nagy answered that it was not.  Metzger walked Nagy, still handcuffed, over to his police cruiser.  Before patting Nagy down, Metzger asked Nagy if Nagy had anything illegal that might poke or stab the officer.  Before Metzger could complete the question, Nagy said that he had a gun on him.  Metzger then Mirandized Nagy and removed the firearm from Nagy's pocket.  Metzger asked Nagy if he wanted to say anything further and Nagy declined.

Metzger and the other officers detained Nagy.  During this detention, one of the other officers said that it would be nice to know where the gun came from so that it could be returned to its owner. In response, Nagy said that he had taken the gun from a car and that he could show the officers where he had gotten it.

-2-

Case No. 1:13-CR-138
Gwin, J.

Nagy now moves to suppress this evidence.  On May 23, 2013, the Court held a hearing in this matter and received testimony from Officer Metzger.  No other witnesses testified.

## II.

The Fourth Amendment guarantees that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[1]

Evidence obtained in violation of the Fourth Amendment cannot be used against a defendant in a criminal proceeding.[2]

Nonetheless, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[3]  "Reasonable suspicion is gauged from the totality of the circumstances."[4]  During an investigatory detention, officers may frisk a suspect for weapons.[5]

The Fifth Amendment prohibits authorities from compelling any person "in any criminal case to be a witness against himself."[6]  Consistent with the Fifth Amendment's privilege against self-incrimination, a suspect may not be subject to a custodial interrogation until after being advised of his Miranda rights.[7]  Custodial interrogations include "questioning initiated by law enforcement

---

[1] U.S. Const. amend. IV.

[2] See *Mapp v. Ohio*, 367 U.S. 643, (1961); *Wong Sun v. United States*, 371 U.S. 471, 485 (1962) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.").

[3] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

[4] See *Terry*, 392 U.S. at 30.

[5] *Id.*

[6] U.S. Const. amend. V.

[7] *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.1998).

Case No. 1:13-CR-138
Gwin, J.

officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[8]  "[I]f an individual wishes to assert either the right to remain silent or the right to the presence of counsel, *Miranda* requires the police to scrupulously honor this decision. 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'"[9]

### III.

Metzger had numerous objective bases to detain Nagy.  A caller informed Metzger that someone had been tampering with his vehicle.  Metzger saw footprints in the snow that confirmed the caller's statements.  He followed these footprints as they approached other vehicles.  The footprints led to a man dressed in black leaning into a vehicle.  The entire course of events took place between three o'clock and five o'clock in the morning.  These are the articulable facts that suggest that criminal activity may be afoot, and, thus, permitted Metzger to detain Nagy under *Terry*.  Indeed, they may even suffice to give probable cause to believe Nagy had broken into the caller's car.

Metzger's subsequent discovery of the gun is also protected under the inevitable discovery doctrine.  The "inevitable discovery exception applies when, at the time of the unlawful search, there was a separate independent line of investigation underway or there are compelling facts indicating that the disputed evidence would have inevitably been discovered."[10]  Because Metzger had reasonable suspicion to detain Nagy, he was entitled to pat him down.  Even if Metzger had not asked Nagy if he had anything sharp, he would inevitably have frisked Nagy, felt the firearm, and

---

[8]*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[9]*McKinney v. Ludwick*, 649 F.3d 484, 489 (6th Cir. 2011) *cert. denied*, 132 S. Ct. 1559, 182 L. Ed. 2d 185 (2012) (quoting *Miranda*, 384 U.S. at 475).

[10]*United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995).

Case No. 1:13-CR-138
Gwin, J.

retrieved it to protect himself. Thus, even independent of Metzger's question to Nagy, Metzger would have found the firearm, and, thus, it need not be suppressed.

Moreover, Metzger's question to Nagy—whether he had anything sharp—was also permissible. Metzger's question qualifies as an interrogation, not a search, and thus falls within the purview of the Fifth Amendment.[11]/ Although Metzger asked Nagy this question while he was handcuffed, and thus in custody, it "was not an investigatory question or otherwise calculated to elicit an incriminating response, but rather a natural and automatic response to the unfolding events."[12]/ And to conclude that Officer Metzger had the right to physically seek out something sharp or pointy, but could not ask a question to the same effect would be illogical.[13]/ Accordingly, Nagy's response that he had a gun need not be suppressed.

The same cannot be said of Nagy's second statement, that he had taken the gun from a car. The Government and the Defendant agree that Nagy was in custody and had received a *Miranda* warning when he made this statement. They agree that he had invoked his *Miranda* rights. They also agree that after he did so, one officer said that it would be nice to know where the gun came from in order to return it to its owner. *Miranda*'s proscriptions apply "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."[14]/ Officers discovered a firearm on a man who they believed had been burglarizing cars at 4:00am on a frigid, snowy night. The Court doubts that the officers' first concern

---

[11]/*See* *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013) (officer's question "What is in your pocket? properly analyzed under Fifth Amendment).

[12]/*Id*.

[13]/*See* *id*.

[14]/*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

-5-

Case No. 1:13-CR-138
Gwin, J.

was returning the firearm to its rightful owner.[15]  More likely, the officers hoped to elicit an

incriminating response.[16]  As such, Nagy's response to this interrogation must be suppressed.

**IV.**

For the foregoing reasons, the Court **GRANTS** Nagy's motion to suppress his statement

made to officers after invoking his *Miranda* rights.  The Court **DENIES** Nagy's motion to suppress

the gun found on him on February 17, 2013, and statements made to officers before they frisked and

Mirandized him.

IT IS SO ORDERED.


Dated: May 23, 2013                          s/          *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE

---

[15]*See id. at 303 n. 9* ("The record in no way suggests that the officers' remarks were designed to elicit a response. See n.7, supra. It is significant that the trial judge, after hearing the officers' testimony, concluded that it was 'entirely understandable that [the officers] would voice their concern [for the safety of the handicapped children] to each other.'").

[16]*See id at 301 n. 7* ("This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.")